FILED
9/7/21 11:52 am
CLERK
U.S. BANKRUPTCY
COURT - WDPA

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| In re: | : | Case No. 18-21030-GLT |
| | : | Chapter 7 |
| **AMANDA MINECH,** | : | |
| | : | |
| *Debtor.* | : | |
| | : | |
| | : | |
| **AMANDA MINECH,** | : | |
| | : | |
| *Movant,* | : | Related to Dkt. Nos. 20, 24, and 35 |
| | : | |
| v. | : | |
| | : | |
| **CLEARVIEW FEDERAL** | : | |
| **CREDIT UNION,** | : | |
| | : | |
| *Respondent.* | : | |
| | : | |

| | |
|---|---|
| Mary Bower Sheats, Esq. | Matthew E. Kaslow, Esq. |
| Mary Bower Sheats, Attorney at Law | Roy W. Arnold, Esq. |
| Bridgeville, PA | Blank Rome LLP |
| *Attorney for the Movant* | Philadelphia, PA |
| | *Attorneys for the Respondent* |

## <u>MEMORANDUM OPINION</u>

To ensure a debtor's fresh start, the Bankruptcy Code[1] bars actions designed to

collect, recover, or offset a pre-petition, discharged debt as a personal liability of the debtor.[2]

But the discharge injunction is not a panacea for all problems or hardships following bankruptcy

relief.  Case in point, Amanda Minech (the "Debtor") seeks to reopen her chapter 7 case to hold

Clearview Federal Credit Union ("Clearview") in contempt of the discharge injunction based on

---

[1]     Unless expressly stated otherwise, all references to "Bankruptcy Code" or to specific sections shall be to
the Bankruptcy Reform Act of 1978, as thereafter amended, 11 U.S.C. § 101, *et seq*. All references to
"Bankruptcy Rule" shall be to the Federal Rules of Bankruptcy Procedure.

[2]     <u>See</u> 11 U.S.C. § 524(a)(2).

an inaccurate credit report that allegedly damaged her credit score and disqualified her from

receiving a loan from the Federal Housing Administration ("FHA").[3]  Clearview admits the error

and has since corrected it, but denies that the report by itself constituted an act to collect a

discharged debt.[4]  Ultimately, the Court agrees that the credit report was not coercive when

viewed in isolation and, as a result, finds that reopening the case to be unwarranted.  Thus, for

the reasons set forth below, the Court will deny both motions.

## I.    BACKGROUND

The salient facts are not in dispute.  The Debtor filed a voluntary chapter 7

petition on March 19, 2018.  Clearview appeared as a creditor on Schedules D and E/F,

reflecting an unsecured credit card debt and separate a car loan secured by a 2012 Chevrolet

Malibu.[5]  The Debtor did not reaffirm either debt to Clearview.  Following the *Chapter 7*

*Trustee's Report of No Distribution*, the Court granted the Debtor a discharge under section 727

on July 11, 2018.[6]

Two years later, on July 15, 2020, the Debtor discovered that Clearview had

reported to Experian that it "charged off" one of the accounts.  As proof, the Debtor attached an

Experian credit report dated January 29, 2021 to the *Motion for Contempt* as an exhibit (the

"Credit Report").[7]  The *Credit Report* contains three closed accounts pertaining to Clearview.[8]

---

[3]      See *Petition to Reopen Case to File Contempt Motion to Enforce the Discharge Injunction* ("Motion to Reopen"), Dkt. No. 20; *Motion for Civil Contempt to Enforce the Discharge Injunction Against Clearview Federal Credit Union* ("Motion for Contempt"), Dkt. No. 24.

[4]      See *Clearview Federal Credit Union's Response in Opposition to Debtor's (A) Petition to Reopen Case to File Contempt Motion to Enforce the Discharge Injunction and (B) Motion for Civil Contempt to Enforce the Discharge Injunction* ("Response"), Dkt. No. 35.

[5]      See *Schedule D: Creditors Who Have Claims Secured by Property*, Dkt No. 1 at 18; *Schedule E/F: Creditors Who Have Unsecured Claims*, Dkt. No. 1 at 20.

[6]      *Order of Discharge*, Dkt. No.16.

[7]      Ex. 4 – Credit Report, Dkt. No. 24-4.

[8]      *Ex. 4 – Credit Report*, Dkt. No. 24-4 at 26-30.

Two accounts, one identified as a "Credit Card – Revolving Term" and the other an "Auto Loan," show a payment status of "[d]ebt included in or discharged through Bankruptcy Chapter 7, 11, or 12."[9]  The third, described as an "Unsecured Loan," curiously shares an account number with the Auto Loan and has a payment status listed as "Charge-off."[10]  It also notes a past due amount of $634.[11]

The Debtor contends that her credit score dropped 26 points because of the adverse report on the Unsecured Loan.[12]  She disputed the report with Experian, though it is unclear when that occurred or what was said.  Experian responded that Clearview had verified the accuracy of the information reported, but reduced the past due amount from $1,078 to $634 (as reflected in the *Credit Report*).[13]  Two days later, the Debtor sought assistance from the "CreditXpert Wayfinder," which advised her to pay off Clearview to increase her credit score.[14]  Instead, she returned to her bankruptcy counsel for help.

On February 3, 2021, the Debtor's lawyer sent a demand letter addressed to Clearview's Chairperson of the Board of Directors (the "Chairperson").[15]  To avoid a contempt action, the letter urged Clearview to immediately instruct all credit reporting agencies to remove the adverse report and have its attorneys contact her.[16]  When Debtor's counsel did not receive a response from Clearview after 20 days, she filed the *Motion to Reopen* and the *Motion for*

---

[9]     Id. at 28, 30.

[10]    Id. at 26.

[11]    Id.

[12]    *Ex. 3 – Notice of Charge Off*, Dkt. No. 24-3.

[13]    *Ex. 5 – Experian Dispute Report*, Dkt. No. 24-5 at 1-2.

[14]    *Ex. 6 – Credit Assistance Report*, Dkt. No. 24-6.

[15]    *Ex. 7 – Counsel's Letter to Clearview*, Dkt. No. 24-7.

[16]    Id.

*Contempt*.  Notably, the *Motion for Contempt* was similarly served on the Chairperson before the

Court directed the Debtor to complete service in accordance with Bankruptcy Rule 7004(h).[17]

   In the *Motion for Contempt*, the Debtor argues that Clearview willfully violated

the discharge injunction by improperly reporting the Unsecured Loan as a "charge-off" rather

than discharged in bankruptcy.[18]  As the "direct and proximate result" of the adverse report, she

alleges that her credit score dropped by 26 points, placing her below the level needed to qualify

for a FHA mortgage loan.[19]  Consequently, the Debtor was unable to purchase "the home of her

choice" and has remained in a rented dwelling.[20]  She contends that she has suffered damages in

excess of $10,000 and incurred $2,500 in attorney's fees.[21]  Yet critically missing from the

*Motion for Contempt* is any assertion that the adverse report was an act to collect a debt.  Also

absent is an allegation that Clearview refused to correct the adverse report.

   In response, Clearview denies that it tried to collect a debt, but concedes that it

inadvertently mischaracterized the status of one account to Experian.  The erroneous report

allegedly stems from a mistake made during an internal record update that reclassified the credit

card as a loan, apparently creating a third account (the Unsecured Loan) that was reported

---

[17] See Fed. R. Bankr. P. 7004(h).  Bankruptcy Rule 7004(h) provides in relevant part:

  Service on an insured depository institution . . . in a contested matter or adversary
  proceeding shall be made by certified mail addressed to an *officer* of the institution
  unless—

   (1) the institution has appeared by its attorney, in which case the attorney shall
   be served by first class mail;
   (2) the court orders otherwise after service upon the institution by certified mail
   of notice of an application to permit service on the institution by first class mail
   sent to an officer of the institution designated by the institution; or
   (3) the institution has waived in writing its entitlement to service by certified
   mail by designating an officer to receive service.

  Id. (emphasis added).

[18] *Motion for Contempt*, Dkt. No. 24 at ¶ 19.

[19] Id. at ¶¶ 20-23.

[20] Id. at ¶¶ 24-25.

[21] Id. at ¶ 26.

alongside the two accurately discharged accounts.[22]   Clearview insists it did not discover the problem earlier because the Debtor's communication with Experian related to the overall status of the account and did not identify the discharge as the impetus for her complaint.[23]   Otherwise, Clearview asserts that the adverse report was promptly corrected once the demand letter, which the Debtor "improperly" addressed to the Chairperson, was received by the appropriate department.[24]   Indeed, Clearview informed Debtor's counsel of their corrective actions the same day she filed the motions.[25]

At the hearing on both motions, the Debtor explained that Clearview's remedial measures had only increased her credit score by 7 points and suggested it could take months for it to fully recover.[26]   Though she admitted that her allegations against Clearview were confined to credit reporting, the Debtor relied on *In re Torres*[27] and *In re DiBattista*[28] to argue that post-discharge false credit reporting is itself a collection activity.   In contrast, Clearview cited *In re Helmes*[29] for the proposition that a derogatory credit report arising from human error is not an act to collect a debt.   The parties did not request an opportunity to brief the issues, though the Debtor

---

[22]   *Response*, Dkt. No. 35 at ¶¶ 4-5; *Declaration of Donna Love in Support of Clearview Federal Credit Union's Response in Opposition to Debtor's (A) Petition to Reopen Case to File Contempt Motion to Enforce the Discharge Injunction and (B) Motion for Civil Contempt to Enforce the Discharge Injunction* (the "Love Declaration"), Dkt. No. 35-1 at ¶¶ 3-4.

[23]   *Response*, Dkt. No. 35 at ¶ 6.

[24]   Id. at ¶¶ 8-13; *Love Declaration*, Dkt. No. 35-1 at ¶¶ 5-8.

[25]   *Declaration of Matthew E. Kaslow in Support of Clearview Federal Credit Union's Response in Opposition to Debtor's (A) Petition to Reopen Case to File Contempt Motion to Enforce the Discharge Injunction and (B) Motion for Civil Contempt to Enforce the Discharge Injunction* (the "Kaslow Declaration"), Dkt. No. 35-2 at ¶¶ 2-4.

[26]   For the sake of completeness, the Court notes that Clearview posits that the erroneous report may not have been the sole cause of the 26-point drop in the Debtor's credit score.   See *Response*, Dkt. No. 35 at ¶¶ 23-26.   Ultimately, that is a question of fact beyond the current procedural posture.

[27]   Torres v. Chase Bank USA, N.A. (In re Torres), 367 B.R. 478 (Bankr. S.D.N.Y. 2007).

[28]   DiBattista v. Selene Fin., LP (In re DiBattista), 615 B.R. 31, 43 (S.D.N.Y. 2020)

[29]   Helmes v. Wachovia Bank, N.A. (In re Helmes), 336 B.R. 105, 109 (Bankr. E.D. Va. 2005).

did suggest an evidentiary hearing was warranted to prove her damages.  At the end of oral

arguments, the Court took the matter under advisement.

## II.    JURISDICTION

This Court has authority to exercise jurisdiction over the subject matter and the

parties under 28 U.S.C. §§ 157(a), 1334, and the Order of Reference entered by the United States

District Court for the Western District of Pennsylvania on October 16, 1984.  This is a core

proceeding under 28 U.S.C. § 157(b)(2).

## III.    DISCUSSION

### A.    Reopening a Bankruptcy Case

Under section 350(b), "[a] case may be reopened in the court in which such case

was closed to administer assets, to accord relief to the debtor, or for other cause."[30]  The burden

is on the moving party to establish cause to reopen.[31]  The court enjoys broad discretion in

making this determination,[32] but "[w]here it is futile or a waste of judicial resources to reopen the

case, including when the movant cannot ultimately obtain the substantive relief [sought], there is

no reason to grant the motion."[33]

The need to enforce the discharge injunction is an appropriate reason to reopen a

closed case.  Therefore, the Court should grant the *Motion to Reopen* if the *Motion for Contempt*

states a plausible violation of the discharge injunction.  Without a violation to redress, there is no

need to reopen the case.  The standard is akin to that of a motion to dismiss under Federal Rule

---

[30]    11 U.S.C. § 350(b).

[31]    Burnett v. Janocha (In re Janocha), No. BR 06-20191-JAD, 2015 WL 128152, at *2 (Bankr. W.D. Pa. Jan. 8, 2015) (citing In re Janssen, 396 B.R. 624, 634 (Bankr. E.D. Pa. 2008)).

[32]    See In re Lazy Days' RV Ctr. Inc., 724 F.3d 418, 423 (3d Cir. 2013); In re Zinchiak, 406 F.3d 214, 223 (3d Cir. 2005).

[33]    Murphy v. U.S. Dep't of Educ. (In re Murphy), 547 B.R. 875, 879 (Bankr. W.D. Pa. 2016).

of Civil Procedure 12(b)(6),[34] with the *Motion for Contempt* serving as the functional equivalent

of a complaint.[35]  Since the operative facts are not in dispute, the question before the Court is one

of pure law.

      B.    <u>The Discharge Injunction</u>

      Typically, "[w]hen a Chapter 7 debtor successfully completes his or her

bankruptcy case, the bankruptcy court . . . enters a discharge order releasing the debtor from

personal liability for most pre-bankruptcy debts."[36]  This "discharge operates as an injunction

against a broad array of creditor efforts to collect debts as personal liabilities of the discharged

debtor."[37]  Specifically, section 524(a)(2) prohibits "the commencement or continuation of an

action, the employment of process, or an act, to collect, recover or offset any such debt as a

personal liability of the debtor."[38]  Because the Code does not explicitly provide a remedy for a

violation of the discharge injunction, courts have determined that it may be enforced through

civil contempt proceedings under section 105(a).[39]

      To hold a creditor in civil contempt, the debtor must prove by clear and

convincing evidence:[40] "(1) that a valid court order existed; (2) that the alleged contemnor knew

---

[34]    See <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009).

[35]    See Fed. R. Bankr. P. 9014(a).

[36]    <u>Zellner v. Lutz (In re Zellner)</u>, No. 5-15-BK-01286 RNO, 2020 WL 1181337, at *4 (Bankr. M.D. Pa. Mar. 11, 2020) (citing 11 U.S.C. § 727).

[37]    <u>Joubert v. ABN AMRO Mortgage Grp., Inc. (In re Joubert)</u>, 411 F.3d 452, 456 (3d Cir. 2005).

[38]    11 U.S.C. § 524(a)(2).

[39]    <u>Taggart v. Lorenzen</u>, 139 S. Ct. 1795, 1801, 204 L. Ed. 2d 129 (2019); <u>Englert v. Ocwen Loan Serv., LLC (In re Englert)</u>, 495 B.R. 266, 271 (Bankr. W.D. Pa. 2013); <u>In re Comensky</u>, No. BR 12-23166-JAD, 2013 WL 1953300, at *2 (Bankr. W.D. Pa. May 3, 2013); <u>Brown v. Bank of America (In re Brown)</u>, 481 B.R. 351, 357 (Bankr. W.D. Pa. 2012); <u>Fonner v. Overdorf (In re Fonner)</u>, 262 B.R. 350, 358 (Bankr. W.D. Pa. 2001), <u>subsequently aff'd</u>, 47 F. App'x 178 (3d Cir. 2002); <u>Penrod v. Arone (In re Penrod)</u>, 163 B.R. 62, 63 (Bankr. W.D. Pa. 1994).

[40]    <u>Bonnanno v. HSBC Card Servs. (In re Bonanno)</u>, No. ADV 08-7035 BM, 2009 WL 8556815, at *6 (Bankr. W.D. Pa. Mar. 24, 2009) (citing <u>John T. ex rel. Paul T. v. Delaware County Intermediate Unit</u>, 318 F.3d 545, 552 (3d Cir. 2002)).

of the order; and (3) that the contemnor disobeyed the order."[41]  In *Taggart v. Lorenzen*, the

Supreme Court of the United States emphasized that obedience is generally an objective

standard, noting that subjective intent or an absence of willfulness will not insulate a party from

civil contempt.[42]  Nevertheless, civil contempt is inappropriate "where there is [a] *fair ground of*

*doubt* as to the wrongfulness of the defendant's conduct."[43]  This rule originates from the notion

that "principles of 'basic fairness requir[e] that those enjoined receive explicit notice' of 'what

conduct is outlawed' before being held in civil contempt."[44]  Thus, "a court may hold a creditor

in civil contempt for violating a discharge order . . . if there is no objectively reasonable basis for

concluding that the creditor's conduct might be lawful.[45]

       To violate the discharge injunction, disobedience "require[s] some affirmative

*collection* efforts on the part of the creditor."[46]  Indeed, while applicable to "a broad array of

creditor efforts to collect debts,"[47] the discharge injunction "is not [a] lifelong shield against

other acts—including demands, threats, assertions of claims, and litigation—by those same

creditors, even where these other acts are undertaken wrongfully and in bad faith."[48]  The

proscription targets the objective effect of the conduct ("to collect, recover or offset . . ."),[49]

meaning that even facially permissible acts may constitute de facto impermissible collection

---

[41]    In re Englert, 495 B.R. at 272; see Harris v. City of Philadelphia, 47 F.3d 1311, 1326 (3d Cir. 1995).

[42]    Taggart v. Lorenzen, 139 S. Ct. at 1802 (citing McComb v. Jacksonville Paper Co., 336 U.S. 187, 69 S.Ct. 497, 93 L.Ed. 599 (1949)).  Subjective intent may nonetheless be relevant to determining an appropriate sanction for the contemptuous conduct.  Id.

[43]    Id. at 1801-02 (quoting California Artificial Stone Paving Co. v. Molitor, 113 U.S. 609, 618, 5 S.Ct. 618, 28 L.Ed. 1106 (1885)) (internal quotation marks omitted, emphasis in original).

[44]    Id. at 1802 (quoting Schmidt v. Lessard, 414 U.S. 473, 476, 94 S.Ct. 713, 38 L.Ed.2d 661 (1974)).

[45]    Id. at 1799.

[46]    In re Comensky, 2013 WL 1953300, at *4 (quoting In re Dendy, 396 B.R. 171, 179 (Bankr. D.S.C. 2008)) (internal quotation marks omitted, emphasis added).

[47]    In re Joubert, 411 F.3d at 456.

[48]    In re Schlichtmann, 375 B.R. 41, 97 (Bankr. D. Mass. 2007).

[49]    See 11 U.S.C. § 524(a)(2).

activity.[50]   To discern whether an act is one to collect a debt, courts consider whether the

creditor's conduct objectively had the practical effect of improperly coercing payment of a

discharged debt.[51]   The analysis is context-specific and informed by the facts of the case.[52]

Essentially, the court is looking for "evidence of an *effective* connection between the conduct of

the creditor and the collection of the debt."[53]

Objectively, credit reporting is an unusually agnostic function.   Its primary

purpose is to share information relevant to making credit decisions,[54] not modify the behavior of

a debtor.  In fact, credit reports are not even communicated to their subjects directly.  Yet it is

undeniable that the negative impact of a creditor's derogatory report can bring significant

pressure to bear when discovered.  And, of course, pressure naturally provokes action, so it is fair

---

[50]   See, e.g., Montano v. First Light Federal Credit Union (In re Montano), 493 B.R. 852, 859 (Bankr. D.N.M. 2013); Mahoney v. Washington Mutual, Inc. (In re Mahoney), 368 B.R. 579, 588-89 (Bankr. W.D. Tex. 2007).

[51]   See Roth v. Nationstar Mortgage, LLC (In re Roth), 935 F.3d 1270, 1276 (11th Cir. 2019) ("we first determine whether a communication is a prohibited debt collection under section 524 by looking to whether the objective effect of the creditor's action is to pressure a debtor to repay a discharged debt.") (internal quotation marks omitted); Venture Bank v. Lapides, 800 F.3d 442, 448 (8th Cir. 2015) (the discharge injunction bars a creditor acts which objectively influence or induce a debtor into repaying a discharged debt); Paul v. Inglehart (In re Paul), 534 F.3d 1303, 1308 (10th Cir. 2008) ("the question is whether the creditor's conduct had the practical, concrete effect of coercing payment of a discharged debt, and bad faith is not required."); Pratt v. GMAC (In re Pratt), 462 F.3d 14, 19 (1st Cir. 2006) ("In assessing violations of the automatic stay and the discharge injunction, the core issue is whether the creditor acted in such a way as to "coerce" or "harass" the debtor improperly."); Krisiak v. Trumark Fin. Credit Union (In re Krisiak), 613 B.R. 606, 612 (Bankr. M.D. Pa. 2020) ("The discharge injunction may be violated by an act to collect a discharged debt or an act that has the practical effect of coercing payment of a discharged debt."); Zellner v. Lutz (In re Zellner), No. 5-15-BK-01286 RNO, 2020 WL 1181337, at *4 (Bankr. M.D. Pa. Mar. 11, 2020) (quoting In re Paul, 534 F.3d at 1308).

[52]   Bates v. CitiMortgage, Inc., 844 F.3d 300, 304 (1st Cir. 2016) (quoting Diamond v. Premier Capital, Inc. (In re Diamond), 346 F.3d 224, 227 (1st Cir. 2003)).

[53]   In re Mahoney, 368 B.R. at 589 (emphasis added).  The court further opined that: "an act that is not, in any objective sense, effective as a means of collection, recovery or offset should not count as an act proscribed by the statute."  Id. at 588.

[54]   See In re Jones, 367 B.R. 564, 569 (Bankr. E.D. Va. 2007) ("The reporting of a delinquent debt to a credit reporting agency is not inherently an act to collect a debt but rather to share information relevant to credit granting decisions. A creditor reports both performing and delinquent accounts in the expectation that other credit grantors will do the same, enhancing each creditor's ability to evaluate proposed credit transactions and to avoid extending credit or making loans to poor credit risks.").

to acknowledge that credit reporting at least broadly encourages the payment of debts.[55] But this

level of influence is not inherently coercive or improper.[56] Further complicating matters is that

credit reporting is *generally* permitted by statute notwithstanding a bankruptcy filing.[57]

      None of this is to say that credit reporting cannot violate the discharge injunction

(or automatic stay).[58] To the contrary, a substantial body of law has developed and there is

universal agreement that credit reporting *can* constitute an act to collect a debt. But to cast the

otherwise innately ambiguous act of credit reporting as something more coercive requires

evidence to objectively connect it to a collection activity.[59] Although not required, other

---

[55] In re Jones, 367 B.R. at 569-70.

[56] To emphasize the difference, consider the following example. Prior to receiving a discharge, a debtor borrowed money from a close friend. Upset that the loan will never be repaid, the friend no longer socializes with the debtor. The debtor, unhappy with the cold shoulder and knowing that repayment would smooth things over, feels pressure to repay the friend despite the discharge. Although the decision to cut ties with the debtor over the debt may ultimately coax the debtor into doing so, the friend's conduct cannot be said to be improperly coercive towards that end.

[57] See 15 U.S.C. § 1681c(a)(1) (prohibiting consumer reporting agencies from reporting bankruptcy cases for "*more than 10 years*" after the "date of entry of the order for relief or the date of adjudication") (emphasis added); Mortimer v. JP Morgan Chase Bank, Nat. Ass'n, No. C 12-1936 CW, 2012 WL 3155563, at *3 (N.D. Cal. Aug. 2, 2012) ("While it might be good policy in light of the goals of bankruptcy protection to bar reporting of late payments while a bankruptcy petition is pending, neither the bankruptcy code nor the [Fair Credit Reporting Act] does so.").

[58] The standard for detecting collection activities under the automatic stay and discharge injunction are similar enough that all the cases addressing credit reporting are relevant and persuasive in either context. See Keller v. New Penn Financial, LLC (In re Keller), 568 B.R. 118, 123 (B.A.P. 9th Cir. 2017).

[59] See Todt v. Ocwen Loan Servicing, Inc. (In re Todt), 567 B.R. 667, 680 (Bankr. D.N.H. 2017) (reporting false or outdated information in an attempt to coerce payment of a discharged debt can violate the discharge injunction); In re Franklin, No. 09-13399-JMD, 2017 WL 3701214, at *7 (Bankr. D.N.H. Aug. 24, 2017) ("Notably, a majority of courts hold that the postpetition reporting of overdue or delinquent payments to credit reporting agencies, without intent to harass or coerce payment, is not a per se violation of the automatic stay."); Henriquez v. Green Tree Serv., LLC (In re Henriquez), 536 B.R. 341, 349 (Bankr. N.D. Ga. 2015) ("When the credit reports clearly indicate that the Plaintiffs owe nothing on the Loan and that it was discharged in bankruptcy, it does not appear that the Defendant is coercing or pressuring the Plaintiffs to pay anything."); In re Zine, 521 B.R. 31, 40 (Bankr. D. Mass. 2014) ("Typically courts require creditor reporting to be coupled with other acts, such as substantial contacts by telephone or mail, to evidence that it was done to coerce payment from the debtor"); Giles v. Nutter & Co. (In re Giles), 502 B.R. 892, 904 (Bankr. N.D. Ga. 2013) ("Nutter proved that its purpose in making such reports to credit reporting agencies had nothing to do with the collection of note payments from Mrs. Giles as her personal liability."); In re Montano, 493 B.R. at 859 ("an alleged credit reporting practice was facially permissible, but could nevertheless violate the discharge injunction if its objective effect is prohibited, i.e. if it really serves to pressure the debtor to pay a discharged debt.") (internal quotation marks omitted); In re Mahoney, 368 B.R. at 592-94 (no evidence of link between post-discharge credit reporting and collection of debts); In re Jones,

collection activity helps to place the credit report in context.[60]  Similarly, a refusal to change a

knowingly inaccurate report may suggest that the creditor is seeking to collect a debt.[61]  Beyond

these situations, "[i]t is largely a matter of the court knowing [coercion] when it smells it."[62]

---

367 B.R. at 570 ("But where the action complained of does not on its face constitute an act to collect a debt, the burden is on the debtor to show that the creditor took the challenged action for the specific purpose of collecting a discharged debt."); In re Lohmeyer, 365 B.R. 746, 747 (Bankr. N.D. Ohio 2007) ("the key reasoning applicable to the current case is the possibility that simply reporting a debt may be a violation of the discharge injunction depending on the purpose and circumstances of the report."); In re Helmes, 336 B.R. at 109 ("the debtor failed to show that submitting the derogatory report to the credit reporting agency or allowing it to remain in the debtor's credit record was an act intended to collect a debt."); Smith v. Am. Gen. Fin., Inc. (In re Smith), No. 00-02375, 2005 WL 3447645, at *3 (Bankr. N.D. Iowa Dec. 12, 2005) ("There is some precedent for the finding of a violation of the discharge injunction from a credit report notation made with the intent to collect a debt."); Irby v. Fashion Bug (In re Irby), 337 B.R. 293, 295 (Bankr. N.D. Ohio 2005) ("if the act of reporting a debt was undertaken for the specific purpose of coercing the debtor into paying the debt, a violation of the discharge injunction could be established."); In re Miller, No. 01-02004, 2003 WL 25273851, at *2 (Bankr. D. Idaho Aug. 15, 2003) ("Debtor has not shown that Equifax has any interest in the recovery or collection of the debts listed in its report"); Vogt v. Dynamic Recover Servs. (In re Vogt), 257 B.R. 71 (Bankr. D. Colo. 2000) ("False reporting, if not done to extract payment of the debt, is simply not an act proscribed by [section 524(a)(2)] of the Code."); In re Thistle, No. 96-17127-SSM, 1998 WL 35412015, at *7 (Bankr. E.D. Va. July 17, 1998) ("a black mark on a credit report will generally, by the very nature of things, have a coercive or harassing effect.").

[60]  See Bibolotti v. American Home Mortgage Servicing, Inc., 2013 WL 2147949, at *14 (E.D.Tex. May 15, 2013) ("The Court finds that in this case, the continuous credit reporting, combined with the constant communications regarding 'loss mitigation' options, and the ARM Notices that continued to remind Plaintiff of the changing interest rate, payment amount, payment due date, and the outstanding principal balance due, that this is a larger course of conduct intended by Defendants to coerce Plaintiff into 'voluntarily' making payments or entering into a loan modification or other repayment plan with Defendants. In addition, the Court finds that these acts are likely effective as measures to collect on the debt."); In re Zine, 521 B.R. at 38 ("alleged violative acts need not be viewed in isolation, but also should be considered under the totality of the circumstances to discern whether they evidence a pattern of coercive behavior."); In re Irby, 337 B.R. at 295 (Bankr. N.D. Ohio 2005) ("But since the act, itself, does not violate the discharge injunction, the reporting of the debt will not likely run afoul with the discharge injunction unless it is also coupled with other actions undertaken by the creditor to collect or recover on the debt."); In re Goodfellow, 298 B.R. 358, 362 (Bankr. N.D. Iowa 2003) (finding a violation of the automatic stay and discharge injunction based on creditor's reporting of the debtor's debt as "past due" in addition to its collection letters and threatening phone calls to debtor attempting to collect the debt); Weinhoeft v. Union Planters Bank, N.A. (In re Weinhoeft), No. 00-7072, 2000 WL 33963628, at *1 (Bankr. C.D. Ill. Aug. 1, 2000) (creditor "(i) continuously reported Debtors as delinquent on their mortgage payments to credit reporting agencies, (ii) allowed the publication of notices of delinquent taxes in the local newspaper citing Debtors as owners of the residence, (iii) contacted Debtors regarding property insurance and making future mortgage payments, (iv) attempted to collect a portion of its debt under a proposed "Agreement for Deed", and (v) filed a foreclosure complaint naming Debtors as defendants"); but see In re Todt, 567 B.R. at 680 (despite finding other communications violated the discharge injunction, debtors failed to demonstrate the inaccurate credit report was made in an attempt to coerce the payment of a debt).

[61]  See Carriere v. Proponent Fed. Credit Union, No. CIV.A.03-1894, 2004 WL 1638250, at *1 (W.D. La. July 12, 2004) (debtor stated a claim where the information was repeatedly disputed through Experian but the issue was not corrected); Russell v. Chase Bank USA, N.A. (In re Russell), 378 B.R. 735, 743 (Bankr. E.D.N.Y. 2007) ("one may, at least in the context of a motion to dismiss, infer an intent to collect a

To be sure, inaccurate reports, particularly those updated post-discharge, are suspect.[63]   The Debtor cites two decisions, *In re Torres* and *In re DiBattista*, for the proposition that "courts have had no difficulty recognizing that false or outdated reporting to credit reporting agencies, even without additional collection activity, can constitute an act to extract payment of a debt in violation of section 524(a)(2)."[64]   That statement is true, but is much less meaningful than it sounds.   Basically, it is simply an acknowledgment that some older cases have found that claims based solely on inaccurate credit reporting were sufficiently pled to survive a motion to dismiss.   More critically, however, each of the cases cited in support of that statement applied a low "no set of facts" standard under *Conley v. Gibson*,[65] which was abrogated by the heightened "plausibility" standard announced in *Bell Atl. Corp. v. Twombly*.[66]   In other words, those cases would likely be decided differently today.

Still, *In re DiBattista*, a decision from only a year and a half ago, found this authority persuasive when it upheld the bankruptcy court's finding of a violation of the discharge

---

discharged debt from Chase's refusal to comply with Russell's request to correct his credit information."); In re Jones, 367 B.R. at 570 (Bankr. E.D. Va. 2007) ("if a creditor, having been informed of the problem, inexplicably fails to take corrective action, a debt collection motive may be inferred (particularly where the creditor fails to respond to the motion to reopen alleging such a motive)."); In re Torres, 367 B.R. at 489 ("Chase has not articulated any valid reason for refusing to correct its outstanding report. Its refusal, at this point, obviously is not a matter of inadvertence"); In re Lohmeyer, 365 B.R. at 747 ("If Plaintiff Philip Lohmeyer can prove that Defendant inaccurately reported or failed to update the status of the debt as a current liability of Plaintiff's . . . for the purpose of coercing payment by Plaintiffs notwithstanding the discharge, which would essentially amount to lying in passive wait, then in this court's view a violation of the discharge injunction will have occurred without other overt collection action").

[62]   In re Vogt, 257 B.R. at 70.

[63]   In re Zine, 521 B.R. at 40 ("A post-discharge negative change to the credit report heavily suggests that Bayview sought to collect a discharged debt from the Debtor.").

[64]   In re Torres, 367 B.R. at 486; see In re DiBattista, 615 B.R. at 43 (quoting In re Torres).

[65]   Conley v. Gibson, 355 U.S. 41, 45, 78 S. Ct. 99, 102, 2 L. Ed. 2d 80 (1957) ("a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts *46 in support of his claim which would entitle him to relief.").

[66]   Bell Atl. Corp. v. Twombly, 550 U.S. 544, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007).

injunction.  Indeed, the district court quoted *In re Torres*' conclusions about false credit reporting

with approval in its analysis:

> [A] credit report that continues to show a discharged debt as
> "outstanding," "charged off," or "past due" is unquestionably inaccurate
> and misleading, because end users will construe it to mean that the lender
> still has the ability to enforce the debt personally against the debtor, that
> is, that the debtor has not received a discharge, that she has reaffirmed the
> debt notwithstanding the discharge, or that the debt has been declared non-
> dischargeable.[67]

Noting that the bankruptcy court adopted a similar reasoning, the district court held that

> [a] credit report that continues to show an amount past due, especially one
> that was prepared only after the discharge order, is inaccurate and
> misleading in a way that causes real harm, *and that alone can constitute a
> violation of a discharge order*.[68]

Despite the breadth of that holding, the district court emphasized that the creditor's misleading

credit reporting was in fact coupled other communications to the debtor, "suggesting it was in

fact trying to collect a debt."[69]

To the extent that *In re DiBattista* holds that the harm caused by a misleading

post-discharge credit report can _alone_ establish a violation of the discharge injunction, the Court

respectfully disagrees.  The discharge injunction only prohibits acts to collect a discharged debt

as a personal liability of the debtor.[70]  The harm caused by a misleading report is simply not

dispositive as to whether the act had the practical effect of improperly coercing the payment of a

discharged debt.  It is certainly a relevant consideration, as is the inaccuracy of the report, but the

Court fails to see how those factors alone reflect "an *effective* connection between the conduct of

---

[67]    In re DiBattista, 615 B.R. at 43 (quoting In re Torres, 367 B.R. at 487–88).

[68]    Id. at 43 (emphasis added).

[69]    Id.

[70]    11 U.S.C. § 524(a)(2).

the creditor and the collection of the debt."[71]   In fact, reliance on the ensuing harm seemingly

moves the analysis away from the question of coercion in favor of a per se rule, which has

already been widely rejected by the courts.[72]

      C.    <u>Analysis</u>

      Having reviewed the motions under the applicable standards, the Court concludes

that the *Motion for Contempt* does not state a plausible claim for a violation of the discharge

injunction.   While there is no dispute that the discharge entered here is a valid court order or that

Clearview was aware of it, the facts alleged do not establish Clearview's disobedience.   The

Court stresses that this conclusion rests <u>*solely*</u> on a review of the *Motion for Contempt* and does

not consider the declarations attached to Clearview's response.

      The fundamental problem with the *Motion for Contempt* is that it does not draw

an "effective connection" between the inaccurate credit report and collecting the underlying debt.

Instead, it silently relies on *In re DiBattista*'s assertion that harmful and misleading credit

reporting alone can violate the discharge injunction.   But neither the harm, nor the inaccuracy of

the report, nor the fact that it occurred post-discharge objectively show an act to improperly

coerce the Debtor to pay a discharged debt.   To the contrary, the Court observes that while it is

inaccurate to report discharged debt as "charged off," such a notation literally means that the

debt was written off as uncollectable by the creditor.   Therefore, it appears that the alleged

---

[71]    <u>In re Mahoney</u>, 368 B.R. at 589 (emphasis added).

[72]    Only one sharply criticized decision suggests that all credit reporting is per se an act to collect debt.   <u>In re Sommersdorf</u>, 139 B.R. 700, 701 (Bankr. S.D. Ohio 1991) ("We find that the latter most certainly must be done in an effort to effect collection of the account. . . Such a notation on a credit report is, in fact, just the type of creditor shenanigans intended to be prohibited by the automatic stay."); <u>but see</u> <u>In re Mahoney</u>, 368 B.R. at 586 ("The rhetoric in *Sommersdorf* writes checks that the authorities cannot cash. While it may have been true in *Sommersdorf*—as a factual matter—that the creditor intended to spur collection of the debt when affirmatively placing an entry in the co-obligor's credit report, it is too great a leap to say, as a matter of law, that the mere reporting of a debt to a credit agency is a per se violation of the discharge injunction."); <u>see also</u> <u>In re Keller</u>, 568 B.R. at 122-26 (collecting cases rejecting *Sommersdorf*'s per se view of credit reporting).

violation, which was not communicated to her directly, at least facially signals an end to active collection efforts by that creditor.  Under the circumstances, the Debtor needed to point to something more substantial to suggest objectively improper coercion.  Ultimately, she conceded that there was nothing else to her claim beyond the crediting reporting itself.  In truth, the undisputed facts undermine any hint of coercion because Clearview simultaneously reported the two real debts accurately, and only contacted the Debtor in response to the demand letter to advise her of their corrective steps.  Accordingly, the Court finds that the Debtor has not sustained her burden to state a plausible claim for relief under section 524(a)(2).

To be clear, the Court does not hold that credit reporting must be paired with other collection activity to violate the discharge injunction.  The Court agrees, for example, that an inaccurate credit report could be an act to coerce payment if the creditor knowingly refuses to correct it to reflect the discharge.[73]  That said, the Court generally recognizes the practical challenge to painting a credit report as an act to collect debt, even when materially inaccurate, without other circumstantial evidence.  But even when inaccurate reporting is not violative of the discharge injunction, an aggrieved debtor may still have other remedies.[74]

For all these reasons, the Court finds that reopening the case would be futile because the Debtor cannot prevail on the *Motion for Contempt*.

## IV.   CONCLUSION

Considering the foregoing, the *Motion to Reopen* must be denied, rendering the *Motion for Contempt* moot.  This opinion constitutes the Court's findings of fact and conclusions

---

[73]   In the present case, the Debtor did not allege facts to support the conclusion that Clearview refused to correct the adverse report.  Instead, she only states (without elaboration) that she disputed the report with Experian, and that Clearview did not amend the report to reflect the discharge.  Additionally, given that the Debtor addressed her demand letter to the Chairperson rather than person identified in Fed. R. Bankr. P. 7004(h), the Court cannot infer refusal from Clearview's delayed response.

[74]   See, e.g., 15 U.S.C. §§ 1681n, 1681o.

of law in accordance with Fed. R. Bankr. P. 7052.  The Court will issue a separate order
consistent with this opinion.

        ENTERED at Pittsburgh, Pennsylvania.

Dated: September 7, 2021        _____
        GREGORY L. TADDONIO
        UNITED STATES BANKRUPTCY JUDGE

<u>Case administrator to mail to</u>:
Debtor
Mary Bower Sheats, Esq.
Matthew E. Kaslow, Esq.
Roy W. Arnold, Esq.